# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **LARRY R. BREEDING,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06cv00113 |
| | ) | **MEMORANDUM OPINION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,**[1] | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand this case to the Commissioner for an award of benefits.


### *I. Background and Standard of Review*

Plaintiff, Larry R. Breeding, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).


The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this case pursuant to Federal Rule of Civil Procedure 25(d)(1).

Case 1:06-cv-00113-PMS   Document 16   Filed 08/08/07   Page 1 of 22   Pageid#: 57

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Breeding filed his application for DIB on July 11, 2005, alleging disability as of February 3, 2005, based on rheumatoid arthritis, right shoulder impingement, depression and "nerves." (Record, ("R."), at 56-58, 76, 110.) The claim was denied initially and upon reconsideration. (R. at 39-41, 45, 49-51.) Breeding then requested a hearing before an administrative law judge, ("ALJ"). (R. at 52.) The ALJ held a hearing on July 6, 2006, at which Breeding was represented by counsel. (R. at 254-73.)

By decision dated September 15, 2006, the ALJ denied Breeding's claim. (R. at 16-27.) The ALJ found that Breeding met the disability insured status requirements of the Act for DIB purposes through December 31, 2009. (R. at 18.) The ALJ found that Breeding had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 18.) The ALJ also found that the medical evidence established that Breeding suffered from severe impairments, namely post surgical arthritis of the right foot, residuals of a torn ligament in the right shoulder, pulmonary fibrosis, rheumatoid arthritis, hearing loss, depression and anxiety, but he found that Breeding did not have an impairment or combination of impairments listed at or medically equal

to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18, 21.) The ALJ found that Breeding had the residual functional capacity to perform sedentary[2] work diminished by a need for a sit/stand option, occasional use of the right lower extremity to push and/or pull, an occasional ability to reach overhead with the right arm, the need to avoid tasks requiring good bilateral hearing, an inability to perform tasks requiring more than mild to moderate exertion and a need to perform only simple tasks with no frequent interaction with co-workers or supervisors. (R. at 22.) Thus, the ALJ found that Breeding could not perform his past relevant work. (R. at 25.) Based on Breeding's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Breeding could perform, including those of an assembly worker and a bench worker. (R. at 26.) Thus, the ALJ concluded that Breeding was not disabled under the Act and was not eligible for DIB benefits. (R. at 27.) *See* 20 C.F.R. § 404.1520(g) (2007).

After the ALJ issued his decision, Breeding pursued his administrative appeals, (R. at 12), but the Appeals Council denied his request for review. (R. at 8-11.) Breeding then filed an action in this court seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2007). The case is before this court on the Commissioner's motion for summary judgment filed July 2, 2007.[3]

---

[2]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. *See* 20 C.F.R. § 404.1567(a) (2007).

[3]Breeding has not filed a motion for summary judgment.

## II. Facts

Breeding was born in 1961, (R. at 56), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education and past relevant work experience as brake press operator in a steel warehouse. (R. at 111, 114, 261.) He noted that he was enrolled in remedial classes in school. (R. at 264.) Breeding testified that he could not read and write very well, that he failed the second grade and that he had to attend summer school to obtain his diploma. (R. at 257.) He testified that he stopped working on January 29, 2005, due to breathing difficulty. (R. at 261.) Specifically, Breeding testified that he had been diagnosed with pulmonary fibrosis. (R. at 261.) He testified that he had difficulty breathing, especially in heat and with physical exertion. (R. at 265.) He stated that this made him feel very tired and weak. (R. at 265.) He further stated that he had arthritis in his hands, right shoulder, foot and ankle, and he noted that he had undergone surgery for removal of a "knot" on his foot. (R. at 262-63.) He stated that he was right-handed and that he had difficulty gripping objects. (R. at 258, 264.) Breeding stated that he had a limited range of motion of the right shoulder, making it difficult for him to reach upwards or exert strength. (R. at 265.) Breeding testified that he was able to drive short distances, but that he could not stand on his feet for very long. (R. at 259, 262.) Breeding testified that he had difficulty hearing, and that he heard best with his left ear. (R. at 262.) He stated that he had seen Dr. Ahmed monthly for three or four years. (R. at 264.)

Breeding testified that he experienced anxiety and panic attacks for the previous two or three years. (R. at 266.) He stated that he did not like to be around crowds.

(R. at 266.)  He relayed several life stressors, including going through a divorce and being away from his children, his father's death and his mother's serious illness.  (R. at 266.)  He testified that Zoloft helped his condition some.  (R. at 267.)  Breeding stated that he had not considered counseling.  (R. at 267.)

Jean Hambrick, a vocational expert, also was present and testified at Breeding's hearing.  (R. at 268-72.)  Hambrick classified Breeding's past work as a brake press operator, as performed by Breeding, as heavy[4] and semiskilled. (R. at 268.)  Hambrick was asked to consider an individual of Breeding's age, education and past work experience, who could perform light[5] work, who could occasionally perform postural activities, who could occasionally use the right lower extremity, who could occasionally reach overhead with the right arm, who must avoid exposure to hazardous machines, who could not perform tasks requiring good bilateral hearing and who could perform no more than mild to moderate exertion.  (R. at 269.)  Hambrick testified that such an individual could perform the light, unskilled jobs of an assembly worker, a parts inspector and a packaging worker.  (R. at 269.)  Hambrick was next asked to assume the same individual, but who was limited to the performance of sedentary work.  (R. at 270.)  Hambrick testified that such an individual could perform the sedentary jobs of an assembly worker and a bench worker.  (R. at 270.)  Hambrick testified that an individual with no ability to handle work stresses would not be able

---

[4]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds.  If someone can perform heavy work, he also can perform medium, light and sedentary work.  *See* 20 C.F.R. § 404.1567(d) (2007).

[5]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds.  If someone can perform light work, he also can perform sedentary work.  *See* 20 C.F.R. § 404.1567(b) (2007).

-5-

to perform any of the jobs previously mentioned.  (R. at 271.)  Finally, Hambrick testified that an individual with the limitations set forth in Dr. Ahmed's June 30, 2006, assessment would not be able to perform any jobs.  (R. at 272.)

In rendering his decision, the ALJ reviewed records from Dr. Joseph C. Claustro, M.D.; Johnston Memorial Hospital; Abingdon Internal Medicine; Dr. Emory H. Robinette, M.D.; Dr. Tahir Ahmed, M.D.; Dr. William Humphries, M.D.; Dr. Richard M. Surrusco, M.D., a state agency physician; Appalachian Orthopaedic Associates; Dr. John L. Holbrook, M.D.; Eugenie Hamilton, Ph.D., a state agency psychologist; Blue Ridge Medical Specialists; Dr. Michael B. Baron, M.D.; Dr. Michael J. Hartman, M.D., a state agency physician; Louis A. Perrott, Ph.D., a state agency psychologist; and Brian E. Warren, Ph.D., a licensed clinical psychologist.

On April 1, 2004, Dr. Joseph C. Claustro, M.D., noted no chronic cough or congestion and no chest pain or palpitations.  (R. at 155-56.)  A physical examination revealed fairly good chest expansion with good air exchange and lungs with clear breath sounds.  (R. at 155.)

Breeding saw Dr. Tahir Ahmed, M.D., on February 9, 2005, at which time he was diagnosed with acute bronchitis.  (R. at 172.)  A chest x-ray showed clear lung fields, and a pulmonary granuloma was noted at the right lung base.  (R. at 153.)  On February 17, 2005, Dr. Ahmed ordered a CT of the chest, and referred Breeding to Dr. Emory H. Robinette, M.D., a pulmonary specialist.  (R. at 170, 172.) The CT scan showed no significant pulmonary parenchymal abnormalities.  (R. at 150, 171.)  Evidence of mild chronic interstitial lung disease was noted.  (R. at 150, 171.)  On

-6-

March 2, 2005, Breeding reported coughing up blood off and on.  (R. at 170.)
Scattered rhonchi were noted.  (R. at 170.)

Breeding saw Dr. Robinette on March 23, 2005, for an evaluation of the CT
scan of the chest.  (R. at 158-59.)  Dr. Robinette noted that Breeding had experienced
a persistent cough, congestion and shortness of breath for the previous three months.
(R. at 158.)  Breeding reported exposure to asbestos in the 1980s, and he reported
working in a steel warehouse for 15 years.  (R. at 158.)  He also reported living in a
house heated by coal and wood.  (R. at 159.)  On physical examination, Breeding's
peak expiratory flow rates were 400, and he exhibited diminished breath sounds with
a few rhonchi.  (R. at 159.)  Oxygen saturation was 99 percent.  (R. at 159.)  Dr.
Robinette noted no significant inspiratory crackles.  (R. at 159.)  Breeding was
diagnosed with probable acute tracheobronchitis and was prescribed Advair.  (R. at
159.)  Dr. Robinette also ordered full pulmonary function studies.  (R. at 159.)

On March 30, 2005, Breeding complained of shortness of breath with exertion
and pain in the left chest.  (R. at 169.)  Dr. Ahmed diagnosed dyspnea.  (R. at 169.)
Breeding underwent another chest x-ray and pulmonary function testing on April 19,
2005.  (R. at 160-65.)  The chest x-ray was normal.  (R. at 161.)  Spirometry testing
showed that, at best, Breeding had a "very variable effort pattern."  (R. at 160, 162-
65.)  Lung volume analysis was normal, as was diffusion capacity.  (R. at 160.)  Dr.
Robinette concluded that Breeding's pulmonary reserve appeared normal.  (R. at 160.)
He further noted the possibility of some underlying depression.  (R. at 160.)  Breeding
was prescribed Remeron.  (R. at 160.)

On April 28, 2005, Breeding again complained of shortness of breath, especially at night, and intermittent chest pain. (R. at 167.) He again exhibited scattered rhonchi in the chest. (R. at 167.) Breeding was diagnosed with chronic obstructive pulmonary disease, ("COPD"), and was prescribed Advair. (R. at 167.) On May 27, 2005, Breeding reported feeling nervous all the time, and he complained of sleeping difficulty the previous few weeks. (R. at 167.) He was prescribed Elavil. (R. at 167.) On June 28, 2005, Breeding was again diagnosed with COPD. (R. at 166, 218.) On July 26, 2005, he reported feeling better with some continued shortness of breath. (R. at 166, 218.) His diagnosis remained unchanged. (R. at 166, 218.) On August 22, 2005, Breeding continued to complain of shortness of breath on exertion, and Dr. Ahmed noted that he intended to refer Breeding to a pulmonary specialist. (R. at 217.)

On October 11, 2005, Breeding saw Dr. William Humphries, M.D., for an evaluation of pulmonary fibrosis. (R. at 184-88.) Breeding stated that his dyspnea had worsened to the point of being short of breath at rest. (R. at 184.) A physical examination revealed diminished breath sounds bilaterally and a slight increase in apical diameter of the chest. (R. at 186.) No rales, wheezes or rhonchi were noted. (R. at 186.) Breeding was alert and fully oriented, and his speech was intelligible and sustained. (R. at 186.) His behavior was deemed appropriate, and his thought and idea content were within normal limits. (R. at 186.) Breeding's memory was intact for recent and remote events, and Dr. Humphries opined that his intelligence was within the normal range. (R. at 186.) His affect was deemed appropriate. (R. at 186.) Dr. Humphries diagnosed pulmonary fibrosis by history with a slight increase in apical diameter of the chest and slightly diminished breath sounds. (R. at 187.) He

-8-

opined that Breeding would be limited to sitting, standing and walking six hours in an eight-hour workday, lifting items weighing up to 25 pounds occasionally and lifting items weighing up to 10 pounds frequently. (R. at 187.) Dr. Humphries further limited Breeding to occasional climbing, kneeling and crawling, and he noted a need to avoid heights and hazards, but he imposed no fume restriction. (R. at 187.)

On October 19, 2005, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a physical assessment, concluding that Breeding could perform light work,[6] diminished by an ability to stand for four hours in an eight-hour workday and an ability to occasionally push and/or pull with the right lower extremity. (R. at 192-98.) Dr. Surrusco further found that Breeding could frequently stoop and crouch, but only occasionally climb, balance, kneel and crawl. (R. at 194.) He further found that Breeding was limited in his ability to reach in all directions, including overhead. (R. at 194.) Dr. Surrusco found that Breeding should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation and that he should avoid all exposure to hazards such as heights and machinery. (R. at 195.) Dr. Surrusco imposed no visual or communicative limitations. (R. at 194-95.)

The same day, Eugenie Hamilton, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Breeding suffered from a nonsevere affective disorder, namely depression. (R. at 201-13.) Hamilton found that Breeding had only mild restrictions on his activities of daily living, experienced only mild difficulties in maintaining social functioning and in

---

[6] In a Case Analysis, completed by Dr. Surrusco the same day, he stated that Breeding could perform only sedentary work with the same postural, manipulative and environmental restrictions imposed in his assessment. (R. at 200.)

maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation. (R. at 211.) She further concluded that the evidence did not establish the presence of the "C" criteria of the medical listing for affective disorders, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04. (R. at 212.) Hamilton noted that she found Breeding's allegations only partially credible. (R. at 213.)

The same day, Breeding informed Dr. Ahmed that he stayed depressed, stating that medications helped some. (R. at 216.) Dr. Ahmed diagnosed insomnia and prescribed Lunesta. (R. at 216.) On November 7, 2005, Breeding complained of depression and lack of energy, and he continued to complain of difficulty sleeping. (R. at 216.) He denied suicidal or homicidal thoughts. (R. at 216.) Breeding also complained of difficulty breathing with only minimal exertion. (R. at 216.) Dr. Ahmed diagnosed depression, in addition to COPD, and prescribed Zoloft. (R. at 216.) On November 15, 2005, Breeding complained of chest pain and shortness of breath. (R. at 215.) It was noted that he tolerated Zoloft very well. (R. at 215.) He was again diagnosed with depression. (R. at 215.) On November 18, 2005, an appointment was made with a pulmonologist, and Breeding was referred to psychiatry. (R. at 215.)

On November 28, 2005, Breeding saw Dr. Michael B. Baron, M.D., a pulmonologist, for an evaluation of possible pulmonary fibrosis. (R. at 220-21.) Breeding reported a cough and shortness of breath, and stated that he had been able to walk 50 to 100 yards at most for the previous six to eight months. (R. at 220.) He estimated that he could walk up a flight of stairs before becoming short of breath. (R.

-10-

at 220.) Breeding stated that would awaken to a smothering sensation. (R. at 220.) He reported depression over his divorce and not seeing his children as much as he would prefer. (R. at 220.) Dr. Baron described Breeding as "depressed." (R. at 220.) His oxygen saturation was 98 percent on room air, with a peak flow of 510 liters per minute. (R. at 220.) No wheezing, rhonchi or rales were noted, even on forced expiration. (R. at 220.) Dr. Baron noted that Breeding did not appear nervous during the interview or examination, but that he was depressed. (R. at 220.) Dr. Baron diagnosed dyspnea secondary to chest wall pain. (R. at 221.) He noted no evidence of pulmonary interstitial disease on prior x-rays and CT scans. (R. at 221.) Dr. Baron recommended heat therapy and stretching exercises for chest wall pain. (R. at 221.)

On December 19, 2005, Breeding complained to Dr. Ahmed of severe anxiety and constant depression. (R. at 214.) He reported that his father had died two days previously. (R. at 214.) Breeding reported difficulty sleeping and crying a lot. (R. at 214.)

On January 9, 2006, Breeding again saw Dr. Baron. (R. at 219.) He continued to complain of an occasional smothering sensation at night, and reported that he could walk for approximately 50 yards before becoming short of breath. (R. at 219.) Breeding reported increased cough at night and some tightness in the chest with some chest pain, slightly improved. (R. at 219.) Dr. Baron noted that Breeding was depressed over his father's death and his inability to work at a young age. (R. at 219.) A physical examination revealed a peak air flow of 410 liters per minute with an oxygen saturation level of 97 percent on room air. (R. at 219.) Breeding exhibited minimal to moderate chest wall pain. (R. at 219.) No wheezing, rhonchi or rales were

noted, even on forced expiration. (R. at 219.) Dr. Baron noted that Breeding was alert and oriented and did not appear nervous or depressed. (R. at 219.) He again diagnosed dyspnea secondary to chest wall pain, as well as depression. (R. at 219.) Breeding was again informed to use heat therapy on his chest, which he had not been doing. (R. at 219.)

On February 3, 2006, Dr. Michael J. Hartman, M.D., a state agency physician, completed a physical residual functional capacity assessment, finding that Breeding could perform light work, diminished by an ability to stand and/or walk for only four hours in an eight-hour workday and only an occasional ability to push and/or pull with the right lower extremity. (R. at 222-28.) Dr. Hartman found that Breeding could frequently stoop and crouch, but only occasionally climb, balance, kneel and crawl. (R. at 224.) He further found that Breeding was limited in his ability to reach in all directions, including overhead. (R. at 224.) He opined that Breeding should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation and that he should avoid all exposure to hazards such as heights and machinery. (R. at 225.) Dr. Hartman imposed no visual or communicative limitations. (R. at 224-25.)

The same day, Louis A. Perrott, Ph.D., a state agency psychologist, completed a PRTF, indicating that Breeding suffered from a nonsevere affective disorder, namely depression. (R. at 230-42.) He found that Breeding was only mildly restricted in his activities of daily living, experienced only mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation. (R. at 240.) Perrott opined that Breeding did not meet the "C" criteria of the listing for affective disorders, found at § 12.04.

(R. at 241.)

Breeding saw Brian E. Warren, Ph.D., a licensed clinical psychologist, on April 25, 2006, for a psychological evaluation at the request of his attorney. (R. at 244-48.) He noted that he had stopped taking antidepressants in the past due to side effects. (R. at 244.) He further noted that he was not then currently receiving nebulizer treatments or other breathing medications. (R. at 244.) Warren reported that Breeding appeared immediately as a depressed and tense, but cooperative, individual. (R. at 245.) He showed signs of psychomotor retardation and mental slowing. (R. at 245.) Warren noted that Breeding's affect was flat and his mood was depressed. (R. at 245.) Breeding reported depression for the previous two years, since his divorce from his wife. (R. at 245.) He reported difficulty sleeping, frequent nightmares, poor appetite and decreased libido. (R. at 245.) He further reported becoming easily aggravated and upset. (R. at 245.) Breeding stated that he felt useless, worthless and guilty about not working. (R. at 245.) He stated that he cried at times and that he had intermittent thoughts of suicide over the previous year with no serious intent. (R. at 245.) He reported an inability to maintain concentration and alertness. (R. at 245.) Breeding further reported becoming easily fatigued. (R. at 245.) He reported frequent anxiety and agitation, with occasional restlessness. (R. at 245.) He further complained of visible tremors and an occasional feeling of shakiness. (R. at 245.) Breeding denied symptoms of panic. (R. at 245.)

Warren noted that Breeding was markedly depressed with secondary generalized anxiety. (R. at 245.) He further noted that Breeding's emotional symptoms markedly interfered with his ability to maintain concentration and general

-13-

mental alertness.  (R. at 246.)  Warren administered the Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), on which Breeding obtained a verbal IQ score of 68, a performance IQ score of 70 and a full-scale IQ score of 66.  (R. at 246.)  Warren considered these results to be a valid and reliable measure of Breeding's lifelong level of intellectual functioning.  (R. at 246.)  Warren also administered the Personality Assessment Inventory, ("PAI"), the results of which were deemed valid and conclusive.  (R. at 246.)  While Warren noted some indication of a tendency to manage a negative impression, he found that this did not render the profile invalid, but pointed to a need to moderate interpretation with this tendency in mind.  (R. at 246.)  Warren reported that the scored profile showed marked or near elevations on several clinical scales.  (R. at 246.)  He noted that the key features of the profile were on measures of depression, anxiety, anxiety-related disorders and somatic difficulties.  (R. at 246.)  Warren noted that thinking and concentration problems associated with strong somatic preoccupation characterized the profile.  (R. at 246.)  He stated that Breeding was experiencing marked sadness, loss of pleasure in daily living, sleep and appetite disturbance and loss of sexual and social interest.  (R. at 246.)  Warren noted that Breeding's thought processes were marked by distractibility, difficulty concentrating and difficulty expressing himself.  (R. at 247.)

Warren also administered the Pain Patient Profile, ("P/3"), which yielded a valid profile.  (R. at 247.)  It revealed that Breeding was experiencing severe symptoms of depression.  (R. at 247.)  It further revealed that he was markedly anxious with generalized fear and apprehension and inner turmoil.  (R. at 247.)  Warren noted that Breeding's attention and concentration were likely hampered by his preoccupation with somatic concerns, making it difficult for him to maintain mental

-14-

alertness in any situation. (R. at 247.) His scores indicated a poor prognosis for change. (R. at 247.) Warren opined that Breeding would have extreme difficulty dealing with stress in a work setting. (R. at 247.) He opined that he could not relate effectively with peers or supervisors, and he found his reliability and emotional stability to be poor. (R. at 247.) Finally, Warren opined that Breeding could not maintain a safe or reliable level of mental alertness. (R. at 247.) Warren diagnosed Breeding with major depressive disorder, single episode, severe, generalized anxiety disorder, moderate, and mental retardation. (R. at 248.)

Warren also completed a mental assessment on May 2, 2006, finding that Breeding was moderately limited in his ability to understand, remember and carry out short, simple instructions, to make judgments on simple work-related decisions, to interact appropriately with the public and to respond appropriately to changes in a routine work setting. (R. at 249-50.) He found that Breeding was markedly limited in his ability to understand, remember and carry out detailed instructions, to interact appropriately with supervisors and to interact appropriately with co-workers. (R. at 249-50.) Finally, Warren found that Breeding was extremely limited in his ability to respond to work pressures in a usual work setting. (R. at 250.)

On June 30, 2006, Dr. Ahmed noted that Breeding could not perform repetitive hand manipulation or lift or carry items weighing more than 10 pounds due to degenerative arthritis of his hands. (R. at 144.) He further found that Breeding was unable to stand or walk for extended or periods of time due to degenerative arthritis of the feet. (R. at 144.) Dr. Ahmed found that Breeding was unable to walk more than 50 yards without becoming short of breath due to asthma and COPD. (R. at 144.)

-15-

Finally, Dr. Ahmed opined that Breeding's primary disabling condition was depression and anxiety disorder, resulting in difficulty interacting with people and coping with situations. (R. at 144.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

-16-

By decision dated September 15, 2006, the ALJ denied Breeding's claim. (R. at 16-27.) The ALJ also found that the medical evidence established that Breeding suffered from severe impairments, namely post surgical arthritis of the right foot, residuals of a torn ligament in the right shoulder, pulmonary fibrosis, rheumatoid arthritis, hearing loss, depression and anxiety, but he found that Breeding did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18, 21.) The ALJ found that Breeding had the residual functional capacity to perform sedentary work diminished by a need for a sit/stand option, occasional use of the right lower extremity to push and/or pull, an occasional ability to reach overhead with the right arm, the need to avoid tasks requiring good bilateral hearing, an inability to perform tasks requiring more than mild to moderate exertion and a need to perform only simple tasks with no frequent interaction with co-workers or supervisors. (R. at 22.) Thus, the ALJ found that Breeding could not perform his past relevant work. (R. at 25.) Based on Breeding's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Breeding could perform. (R. at 26.) Thus, the ALJ concluded that Breeding was not disabled under the Act and was not eligible for DIB benefits. (R. at 27.) *See* 20 C.F.R. § 404.1520(g) (2007).

In his brief, Breeding argues that the ALJ erred by failing to find that he suffered from mental retardation, which was a severe mental impairment. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-12.) Breeding also argues that the ALJ erred by failing to find that he suffered from the medical listings for mental retardation, depression and anxiety-related disorders,

found at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04, 12.05(C) and 12.06, respectively. (Plaintiff's Brief at 11-12.) Lastly, Breeding argues that the ALJ erred in his mental and physical residual functional capacity findings. (Plaintiff's Brief at 12.)

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Breeding argues that the ALJ erred by failing to find that he suffered from

-18-

mental retardation, a severe impairment that met or equaled the requirements of the medical listing found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C). In order to qualify as disabled under § 12.05(C), a claimant's condition must meet two requirements: (1) a valid IQ score of 60 through 70 and (2) a physical condition or other mental impairment imposing additional and significant work-related limitation of function. The regulations do not define the term "significant." However, this court previously has held that it must give the word its commonly accepted meanings, among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." *Townsend*, 581 F. Supp. at 159. Additionally, the mental deficits must have manifested during the claimant's developmental stage, i.e., prior to age 22. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. The regulations do provide that "where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D). *See Flowers v. U.S. Dep't of Health & Human Servs.*, 904 F.2d 211 (4th Cir. 1990).

The medical evidence contained in this record documents that Breeding meets the first prong of § 12.05(C) for mental retardation. Intelligence testing performed by psychologist Warren revealed that Breeding had a verbal IQ score of 68, a performance IQ score of 70 and a full-scale IQ score of 66. (R. at 246.) Thus, *all* of the IQ scores fall within the mentally retarded range contained in § 12.05(C). Warren stated that he considered these results to be a valid and reliable measure of Breeding's lifelong level of intellectual functioning. (R. at 246.) Oddly enough, the ALJ did not

even discuss these findings in his decision, nor did he discuss the possibility that Breeding suffered from mental retardation. The Fourth Circuit has held that a claimant's IQ remains relatively constant over his lifetime, absent any evidence of change in intellectual functioning. *See Luckey v. U.S. Dep't of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989) (citing *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985)); *see also Sird v. Chater*, 105 F.3d 401, 403, n.4 (8th Cir. 1997); *Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir. 1986); *Hampton v. Apfel*, 59 Soc. Sec. Rep. Serv. 711, 1999 WL 46614 (E.D. Pa. Jan. 6, 1999); *Durham v. Apfel*, 34 F. Supp. 2d 1373, 1379-80 (N.D. Ga. 1998); *McElroy v. Apfel*, 55 Soc. Sec. Rep. Serv. 751, 1998 WL 196457 (N.D. Ill. Apr. 17, 1998); *Prentice v. Apfel*, 55 Soc. Sec. Rep. Serv. 850, 1998 WL 166849 (N.D. N.Y. Apr. 8, 1998) *Gant v. Sullivan*, 773 F. Supp. 376, 381 (S.D. Fla. 1991).

Here, there is no evidence contained in the record to suggest that there has been a change in Breeding's intellectual functioning so as to render these findings an inaccurate estimate of Breeding's intellectual functioning prior to age 22. To the contrary, the evidence of record corroborates these findings. For instance, academic testing during Breeding's eleventh-grade year showed that he scored in only the 10th percentile in reading, the second percentile in language arts, the 23rd percentile in mathematics, the fifth percentile in social studies, the third percentile in science and the sixth percentile in use of sources, thereby resulting in a composite score of the sixth percentile. (R. at 142.) Furthermore, he testified, and school records confirm, that he was enrolled in remedial classes in school, he was retained during his second grade year and he had to attend summer school in order to obtain his diploma. (R. at 140, 257.) School records further reveal that Breeding received mostly Cs, Ds and Fs

-20-

in high school. (R. at 138.) Moreover, Breeding testified that he could not read, write or spell very well. (R. at 257.) A letter from Breeding to this court dated September 25, 2006, stated that he was unable to spell and that his sister helped him fill out forms.[7] (R. at 251.) Finally, school records show that Breeding was ranked 156 out of 175 students in his graduating class. (R. at 138.) For all of these reasons, I find that the evidence shows that Breeding's mental impairment meets the first prong of § 12.05(C).

I further find that Breeding's mental impairment clearly meets the second prong of § 12.05(C), that he suffers from a physical condition or other mental impairment imposing additional and significant work-related limitation of function. The ALJ himself found that Breeding suffered from post surgical arthritis of the right foot, residuals of a torn ligament in the right shoulder, pulmonary fibrosis, rheumatoid arthritis, hearing loss, depression and anxiety, all of which he considered severe impairments, thereby meeting the second prong of § 12.05(C).

For all of the above-stated reasons, I find that substantial evidence does not support the ALJ's failure to find that Breeding met or equaled the requirements for the listed impairment for mental retardation, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C). Given this disposition, I find it unnecessary to address Breeding's remaining arguments on appeal.

---

[7]Although this letter is signed by Larry R. Breeding, it is unclear whether he or his sister wrote the letter.

*IV. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated, and the case will be remanded to the Commissioner for an award of benefits.

An appropriate order will be entered.

DATED:    This 8th day of August 2007.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE